## UNITED STATES DISTRICT COURT
## NORTHERN DISTRICT OF ALABAMA
## NORTHEASTERN DIVISION

| | | |
|---|---|---|
| CAROL BIRDYSHAW, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| vs. | ) | CV 04-B-0738-NE |
| | ) | |
| DILLARD'S, INC., | ) | |
| | ) | |
| Defendant. | ) | |

## MEMORANDUM OPINION

This case is presently pending before the court on defendant's Motions for Summary Judgment. (Doc. 11, doc. 23.)[1]  Plaintiff Carol Birdyshaw has sued her former employer, defendant Dillard's. Inc., alleging that defendant discriminated against her on the basis of her sex and her age, and that it retaliated against her for complaining about discrimination, in violation of federal law.  Plaintiff also alleges state-law causes of action for negligent, wanton, and/or intentional hiring, training, supervision, and retention.  Upon consideration of the record, the submissions of the parties, the arguments of counsel, and the relevant law, the court is of the opinion that defendant's Motions for Summary Judgment, (docs. 11, 23), are due to be granted.

---

[1]Reference to a document number, ["Doc. ___"], refers to the number assigned to each document as it is filed in the court's record.

## I. <u>SUMMARY JUDGMENT STANDARD</u>

Pursuant to Fed. R. Civ. P. 56(c), summary judgment is appropriate when the record shows "that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." Fed. R. Civ. P. 56(c). The moving party bears the initial burden of showing no genuine issue of material fact and that it is entitled to judgment as a matter of law. *See Clark v. Coats & Clark, Inc.*, 929 F.2d 604, 608 (11th Cir. 1991); *see Adickes v. S.H. Kress & Co.*, 398 U.S. 144, 157 (1970). Once the moving party has met its burden, Rule 56(e) requires the non-moving party to go beyond the pleadings and show that there is a genuine issue for trial. Fed. R. Civ. P. 56(e); *see Celotex Corp. v. Catrett,* 477 U.S. 317, 324 (1986). A dispute is genuine "if the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986).

In deciding a motion for summary judgment, the court's function is not to "weigh the evidence and determine the truth of the matter but to determine whether there is a genuine issue for trial." *Id.* at 249. Credibility determinations, the weighing of evidence, and the drawing of inferences from the facts are left to the jury, and, therefore, evidence favoring the non-moving party is to be believed and all justifiable inferences are to be drawn in her favor. *See id.* at 255. Nevertheless, the non-moving party need not be given the benefit of every inference but only of every ***reasonable*** inference. *See Brown v. City of Clewiston*, 848 F.2d 1534, 1540 n.12 (11th Cir. 1988).

2

## II. __STATEMENT OF FACTS__[2]

Plaintiff, who was born on October 21, 1949, began working for defendant in 1996 as an Area Sales Manager ["ASM"] in the Cosmetics Department at defendant's store in Pensacola, Florida.  (Doc. 1, Ex. B; doc. 13, Ex. A at 95.)  Thereafter, Plaintiff worked for defendant as an ASM in stores in Las Vegas, Nevada; Knoxville, Tennessee; and Murphreesboro, Tennessee.  (Doc. 13, Ex. A at 112, 125, 134-37, 140-42, 170, 175, and ex. 5.)  On July 24, 1999, plaintiff transferred to defendant's Madison Square Mall Store in Huntsville, Alabama.  (*Id.* at 42, 198, and ex. 12.)  At the time of plaintiff's transfer to Huntsville, Bill Morrero was the Store Manager and Mary Davis was the Operations Manager.  (*Id.* at 214.)  Plaintiff was originally assigned to the Shoe Department; later, she transferred to the Cosmetic Department. (*Id.* at 214-15.)

Plaintiff alleges that she was passed over for two promotions to Operations Manager – one in Knoxville, Tennessee in May 2000, and another in Oxford, Alabama in August 2000.  (*Id.* at 225-33, 240, 263-65.)

On May 19, 2000, Rick Willey, District Manager, told plaintiff that he did not select her for the Knoxville Operations Manager position because she had transferred between stores a number of times and because he wanted her to stay in Huntsville for a least a year.  (*Id.* at 244-45, 250-51.)  Willey told plaintiff that he considered her "very qualified" for an

---

[2]The Statement of Facts is drawn from the evidence viewed in the light most favorable to plaintiff, the non-moving party, and all justifiable inferences have been drawn in her favor.

Operations Manager position; however, he was concerned about her history of frequently transferring based on her husband's need to relocate. (*Id*. at 250, 259-60.) He said that he had selected Derek Dykes for the position, even though he had not been at the Huntsville store more than a year, because he was single and "free to relocate." (*Id*. at 249; doc. 18, Ex. 12 ¶ 3.) Plaintiff told Willey she did not believe he should have considered her husband's work in making the promotion decision. (Doc. 13, Ex. A at 249.)

The Oxford store, which was a new store, was under the supervision of Division Vice President Gene Heil, who made the selection decision. (*Id*. at 265-66; *id*., Ex. D ¶ 3.) Heil testified that he had selected only people with experience in the positions of Store Manager and Operations Manager for a new store. (*Id*., Ex. D ¶ 3.) Heil selected Ken Wood, then the Operations Manager at defendant's store in Montgomery, Alabama, for the position of Operations Manager at the Oxford store. (*Id*. ¶ 4.) He testified that plaintiff was not a suitable candidate for the Oxford position because she had no prior experience with defendant as an Operation Manager. (*Id*. ¶ 6.)

In October of 2000, Steve Moretti became the Store Manager at the Huntsville Store. Plaintiff and Moretti worked together until November 25, 2000. (Doc. 13, Ex. A at 290; Amended Complaint, ¶¶ 10-13.

During this time, plaintiff was responsible for organizing a promotional event called "Jazz It Up," which took place in the Cosmetics Department on October 28, 2000. (Doc. 13, Ex. A at 324-25.) Plaintiff was on vacation from October 21, 2000, thru October 29, 2000;

4

therefore, she was on vacation of the day of the event.  (*Id.* at 326-28.)  Plaintiff testified that she had been asked to take her vacation during this week.  (*Id.* at 328.)  She testified that she went to the store on October 27, 2000, to make sure everything was ready for the event.  (*Id.* at 328-30.) Plaintiff testified she was told that, on the day of the event, Moretti was "livid" and "flipped out" because plaintiff was not at work during the event and because "he had to be interrupted" to deal with details of the event.  (*Id.* at 330, 332-34.)  When plaintiff returned from vacation, Moretti called her to his office and told her, "[I]f you and the other damn managers can't do your job, I'll find somebody that can." (*Id.* at 335, 340-41.)

Also, during this time, plaintiff alleges that Moretti told her that her area "look[ed] like shit" on one occasion.  (*Id.* at 349-51.)

As ASM for the Cosmetics Department, plaintiff was responsible for filling open positions in her department.  Sometime in September or October of 2000, the position of Counter Manager became open.  Plaintiff testified that Moretti had told her not to fill the position because he wanted to place the Assistant ASM in the Men's Department in the position.  (*Id.* at 378.)  The Assistant ASM declined the position, but Moretti did not inform plaintiff at the time.  (*Id.* at 379-80.)  On November 25, 2000, Moretti and Davis met with plaintiff regarding the vacant Counter Manager position.  (*Id.* at 361-62.)

During this meeting, Moretti asked plaintiff what efforts she had made to fill the Counter Manager position, and she told him she had contacted other ASMs about the open position.  (*Id.* at 398-99.)  Moretti accused plaintiff of lying about her efforts to fill the

position, and told her, "Don't bullshit me." (*Id*. at 401; *id*., Ex. B at 126-27.) He asked plaintiff to name the ASMs with whom she had discussed the Counter Manager position so that he could confirm her story. (*Id*., Ex. A at 400-02; *id*., Ex. B at 218.) Plaintiff did not name these ASMs. (*Id*., Ex. A at 401, 404-06; *id*., Ex. B at 218.)

Plaintiff testified that she did not respond to Moretti because she was "absolutely terrified." (*Id*., Ex. A at 404.) She told Davis that she did not have to put up with Moretti's behavior, and she told Moretti that his language was inappropriate and she did not appreciate it. (*Id*.) At this point plaintiff walked out of the office. (*Id*.) Plaintiff testified that she "was having extremely strong chest pains" and she "couldn't breath[e]." (*Id*. at 409.) Moretti followed her into the mall, running after her and calling her name. (*Id*. at 409-10.) He caught her, grabbed her by the elbow, and told her to return to the store. (*Id*. at 410-11.) Plaintiff testified she told Moretti, "I'm not going back to the store with you, you were very rude and very abusive, and I can't believe you spoke to me like that as my manager." (*Id*. a 411.) Then, Moretti called plaintiff a "lying bitch." (*Id*.) Plaintiff told Moretti that she was going home and going to call her doctor; she left and never spoke with Moretti again. (*Id*. at 411-12.)

The following day plaintiff faxed a letter to Willey, Burt Squires, President of Division Four, and Mike Dillard. (*Id*., Ex. A, ex. 16.) In this letter she described the meeting with Moretti and Davis, and Morretti's conduct thereafter for purposes of informing defendant's upper management of the incident. (*Id*. at 0391.) Plaintiff did not state that she

6

believed Moretti discriminated against her because of her gender or age.  (*See id*.)  The letter

simply recites the events of that afternoon without any comment.  (*See id*.)

Willey responded to plaintiff's faxed letter.  (*Id*., ex. 18.)  His letter to plaintiff states:

This is in response to your letter . . . in which you claimed a hostile and harassing work environment.  As you know, we take all such complaints very seriously, and I have made it a point to investigate your allegations.

I appears that your statement is highly embellished in comparison to those of both Mr. Moretti and Ms. Davis.  In fact, I believe that the situation was being handled as best it could be under the circumstances.  Most management associates find it hard to maintain their complete composure when an associate does not tell them the truth.  Your statement that you had asked each of the other managers about their associates transferring was blatantly false.  Both Mr. Moretti and Ms. Davis knew this was not true, and when Mr. Moretti threatened to ask each of them about the issue, you simply had no response and walked out.  This is certainly not the attitude we expect of our management staff, especially during the busiest of all seasons.

I would remind you that salary continuation is only for those who are truly ". . . unable to work . . ." and that as of this date, we have received no such certification from any physician.   If you are medically unable to work and feel that this is job-related, please let us know so we can file this with workers [compensation] and direct you to our physician(s) for treatment.

When you return to work, I will make every effort to come to the store as soon as possible to further discuss your situation, and both your and our concerns.

(*Id*., ex. 18.)  This letter is not dated.  (*Id*.)  Willey did not talk to plaintiff during his

investigation.  (*Id*., Ex. A at 436.)

On November 27, 2000, the day after plaintiff had faxed her letter describing the

events of November 25, 2000, plaintiff's doctor, Scariya Kumar, M.D., sent defendant a

request to excuse plaintiff from work until December 12, 2000.  (*Id*., Ex. A, ex. 19.)  On

7

December 11, 2000, Dr. Kumar submitted a form, entitled, " Certification of Health Care Provider (Family and Medical Leave Act of 1993)," advising defendant that plaintiff suffered from depression and anxiety, which he claimed were serious health conditions under the FMLA. (*Id.*, ex. 22.)  Plaintiff received benefits based on defendant's Salary Continuation Policy.

Defendant's Salary Continuation Policy allows an employee to take medical leave and receive his or her full salary for a period of six months.  (Doc. 13, Ex. at 433.)  A salaried employee can receive an additional six months of unpaid leave if they are unable to return to work due to a medical conduction.  (Doc. 13, Ex. C ¶ 4.)  If the employee cannot return to work at the end of the one-year period, defendant terminates the employee automatically. (*Id.*; *id.*, Ex. A at 518-19.)

On January 17, 2001, Moretti wrote plaintiff to inform her that defendant was stopping her Salary Continuation benefits.  (*Id.*, Ex. A, ex. 25.)  In his letter, Moretti states that someone from Parisian, a department store, had called defendant's Huntsville store for a reference check on plaintiff.  (*Id.*)  Ina McNutt, the secretary at defendant's Huntsville store, had told Davis that plaintiff had applied for work with Parisian.  (*Id.*, Ex. B at 238-39.) Plaintiff denies that she applied for work with Parisian.  (*Id.*, Ex. A at 453-54.)

On January 24, 2001, Linda Hatten, Legal Services Coordinator for Saks, Inc., the parent company of Parisian, faxed a letter to Moretti that verified that plaintiff had not contacted Parisian in any manner seeking employment.  (*Id.*, Ex. A, ex. 29; doc. 18, Ex. 1 at

56.)  After receiving the letter, Moretti told plaintiff that, before her benefits would be reinstated, she needed to get a letter from each Parisian store in the Huntsville area, stating that she had not applied for employment. (Doc. 13, Ex. A at 467-68.)  Plaintiff objected and wrote to Ed Auffert, defendant's General Counsel. (*Id.*, Ex. A, ex. 32.)  Auffert reinstated plaintiff's benefits and paid her benefits for the period they had been suspended. (*Id.*, Ex. A, ex. 34.)

Plaintiff filed an EEOC charge on February 16, 2001. (Doc. 1, Ex. A.)  In this charge, plaintiff alleged that defendant had discriminated against her because of her age and gender by failing to promote her and by causing her to work in a hostile work environment.  She also alleged that it had retaliated against her for complaining about discrimination by suspending her Salary Continuation benefits.

By letter dated March 16, 2001, plaintiff requested a transfer to Yuma, Arizona. (*Id.*, ex. 36.)  Plaintiff wrote Squires a letter, which stated:

> Based on my doctor's recommendation that I not return to Dillard's Madison Square Mall (under the supervision of Steve Moretti) and due to Steve Moretti's past discrimination and harassment of me (which is the basis of a currently pending EEOC charge) plus Mr. Willey's failure to adequately investigate or remedy the discrimination and harassment by Steve Moretti, I am requesting a move out of division 4.
>
> I am requesting a transfer to Yuma, Arizona (near my family) to be effective when my doctor releases me to return to work, preferably as an assistant store manager or at my current position, sales manager.

(*Id.*)  Squires did not take any action on plaintiff's transfer request. (Doc. 23, Ex. 1 at 25.)

According to defendant, it has a policy that inactive employees – including those on medical leave – are not eligible for transfer.  (*Id*., Ex. 1 at 16-17; doc. 23, Ex. 1 at 11-12.) Squires testified that defendant's computerized payroll system does not allow any changes in the status of an inactive employee.  (Doc. 23, Ex. 1 at 12, 51.)  He testified that plaintiff would have to return to work before she could transfer.  (*Id*. at 52.)  He also testified that it would not be possible to arrange a transfer in the future because defendant could "not know what positions would be open at a future date."  (*Id*. at 14.)  However, Squires did not tell plaintiff that she had to return to work before she could be transferred because "we were involved in the legal litigation with Ms. Birdyshaw [after she had filed an EEOC charge], so any correspondence with her would have been done by our legal office."  (*Id*. at 14-15.)

The policy of not transferring inactive employees is unwritten.  (*Id*. at 43.)  However, the record contains no evidence that defendant has transferred an inactive employee.

Davis, by letter dated September 17, 2001, advised plaintiff that her leave would be exhausted on November 25, 2001.  (Doc. 13, Ex. A, ex. 46.)  She told plaintiff, "You will need to return to work on or before 11-26-01 or you will be terminated for failure to return from leave of absence."  (*Id*.)  Plaintiff sent Davis a letter in response, dated September 26, 2001, in which she wrote:

> As you know, I am on long term disability medical leave per my doctor's instructions through December 1, 2001 due to the hostile environment I experienced at Dillard's.
>
> Please inform me what policy or rule Dillard's contends supports its decision to terminate me.

Also, consider this letter as a request for accommodation of my disability[3] to extend with the leave my doctor has indicated is necessary or may indicate in the future is necessary.

I have previously requested a transfer to the Yuma, Arizona location.  I am staying in El Centro, California to be with my aged mother.  Please consider this letter as a renewed request for transfer to Yuma when the doctor says I may return to work.

(*Id.*, Ex. A, ex. 47 [footnote added].)  On October 19, 2001, plaintiff again wrote Davis and included her doctor's note, which stated that plaintiff would need additional leave until February 1, 1002.  (*Id.*, exs. 48, 49.)  In this second letter, plaintiff told Davis:

Please consider this letter as a request, that as a reasonable accommodation of my disability, Dillard's extend my excused absence to February 1, 2002.  I need my job and do not want to be terminated but as you can see my doctor says I cannot return to work by November 26, 2001, which your letter indicated was my deadline for returning to work.

Please let me know Dillard's response to this request for reasonable accommodation at your earliest opportunity, as well as to my previous request that when I am able to return to work, that I be transferred to a different division, also as a reasonable accommodation.

(*Id.*, ex. 49.)

On November 19, 2001, plaintiff's disability insurance benefits were discontinued.  (*Id.*, Ex. 50.)  According to the cancellation letter, plaintiff's doctor, on November 14, 2001, had told the disability insurance provider that plaintiff was employable.  (*Id.*)  The doctor told the insurance provider that he believed plaintiff "could return to work 'tomorrow' if transferred to another store location."  (Doc. 18, Ex. 12, ex. 5 at 3.)  The record does not

---

[3]Plaintiff's Complaint does not alleged disability discrimination.

11

indicate that plaintiff's doctor told defendant she could return to work at the Huntsville, Alabama store location.

Plaintiff did not return to work on November 26, 2001, and defendant terminated her automatically.  (*Id.*, Ex. 12 ¶18; *id.*, Ex. 1 at 12-13; doc. 13, Ex. A, ex. 52.)  Zena Jones, born in 1955, replaced plaintiff as the ASM for the Cosmetics Department.  (Doc. 13, Ex. C ¶ 3.)

Plaintiff filed a second EEOC charge.  In this charge she alleged that defendant had discriminated against her on the basis of her sex, age, and disability.  She also alleged that defendant had refused to transfer her and had terminated her in retaliation for her first EEOC charge.

### III.  <u>DISCUSSION</u>

### A.  HOSTILE WORK ENVIRONMENT

Plaintiff contends that she was subjected to a hostile work environment based on her gender and her age.  Defendant contends that the harassment of which plaintiff complains was not sufficiently severe or pervasive to rise to the level of an objectively hostile work environment.  Because plaintiff has not shown that the harassment was sufficiently severe or pervasive to support a hostile-environment claim, the court pretermits discussion of defendant's other grounds for granting its Motions for Summary Judgment on this claim.

"When the workplace is permeated with discriminatory intimidation, ridicule, and insult that is sufficiently severe or pervasive to alter the conditions of the victim's employment and create an abusive working environment, Title VII is violated."  *Oncale v.*

*Sundowner Offshore Services, Inc.*, 523 U.S. 75, 78 (1998).  In *Gupta v. Florida Board of Regents*, the Eleventh Circuit held:

> The fourth element – that the conduct complained of was "sufficiently severe or pervasive to alter the conditions of employment and create an abusive work environment" – is the element that tests the mettle of most sexual harassment claims.  Requiring the plaintiff to prove that the harassment is severe or pervasive ensures that Title VII does not become a mere "general civility code."

*Gupta v. Florida Board of Regents*, 212 F.3d 571, 583 (2000)(citing *Faragher v. City of Boca Raton*, 524 U.S. 775, 788 (1998)).  "Title VII prohibits only the type of severe or pervasive sexual harassment that 'alter[s] the conditions of the victim's employment.'" *Johnson v. Booker T. Washington Broadcasting Service*, 234 F.3d 501, 509 (11th Cir. 2000)(quoting *Oncale*, 523 U.S. at 80-81).  It "does not prohibit all verbal or physical harassment in the workplace, and does not reach genuine, but innocuous, differences in the ways men and women routinely interact with members of the same sex and of the opposite sex." *Id*. (internal quotations omitted).  "[S]imple teasing, offhand comments, and isolated incidents (unless extremely serious) will not amount to discriminatory changes in the 'terms and conditions of employment.'" *Faragher*, 524 U.S. at 788.

In *Mendoza*, the Eleventh Circuit, sitting en banc, reiterated the standards applicable to hostile environment claims:

> Establishing that harassing conduct was sufficiently severe or pervasive to alter an employee's terms or conditions of employment includes a subjective and an objective component. . . . .  The employee must subjectively perceive the harassment as sufficiently severe and pervasive to alter the terms or conditions of employment, and this subjective perception must be objectively

13

reasonable.  The environment must be one that a reasonable person would find hostile or abusive and that the victim subjectively perceives to be abusive.  Furthermore, the objective severity of harassment should be judged from the perspective of a reasonable person in the plaintiff's position, considering all the circumstances.

The objective component of this analysis is somewhat fact intensive.  Nevertheless, the Supreme Court and this Court have identified the following four factors that should be considered in determining whether harassment objectively altered an employee's terms or conditions of employment: (1) the *frequency of the conduct*; (2) *the severity of the conduct*; (3) *whether the conduct is physically threatening or humiliating, or a mere offensive utterance*; and (4) *whether the conduct unreasonably interferes with the employee's job performance*.  The courts should examine the conduct in context, not as isolated acts, and determine under the totality of the circumstances whether the harassing conduct is sufficiently severe or pervasive to alter the terms or conditions of the plaintiff's employment and create a hostile or abusive working environment.

*Mendoza v. Borden, Inc.*, 195 F.3d 1238, 1246 (11th Cir. 1999)(internal quotations and citations omitted; emphasis added).  The Supreme Court in *Faragher* held, "We have made it clear that conduct must be *extreme* to amount to a change in the terms and conditions of employment . . . ."  *Faragher*, 524 U.S. at 788 (emphasis added; citations omitted).

Plaintiff testified that Moretti harassed her or was abusive on three occasions: (1) their meeting following the "Jazz It Up" event when Moretti told her she could be replaced; (2) the time Moretti told plaintiff her work area "look[ed] like shit;" (3) their meeting regarding the Counter Manager position and what happened that day.  Plaintiff also alleged that Moretti harassed other, older women – including Carol Tomblin, Cheryl Boudreaux and Markita

14

Dudley.[4]  Neither Boudreaux nor Dudley testified that they told plaintiff about Moretti's abuse before she left work.  Incidents that plaintiff did not know about until after she left could not have contributed to her subjective view of a hostile environment.  *Edwards v. Wallace Community College*  49 F.3d 1517, 1522 (11th Cir. 1995).  Tomblin testified she told plaintiff about Moretti screaming at her and grabbing her neck before plaintiff left work.  The court has considered evidence that Tomblin told plaintiff of her abuse by Moretti and that this information influenced plaintiff's perception of her work environment.[5]

Nevertheless, based on the totality of the circumstances as set forth in the record and considering existing Eleventh Circuit case law, the court finds that these incidents of harassment are not sufficiently objectively severe and/or pervasive to alter plaintiff's work environment.  *Compare Hulsey v. Pride Restaurants*, 367 F.3d 1238, 1248 (11th Cir. 2004)(finding harassment was objectively severe and pervasive based on 18 incidents over two and half weeks including the harasser's "direct as well as indirect propositions for sex," "following [plaintiff] into the restroom, and repeated attempts to touch her breasts, place his

---

[4]Defendant has moved to strike this evidence on the ground that plaintiff did not disclose this evidence and these witnesses pursuant to Rule 26, Fed. R. Civ. P.  For the reasons set forth above, the court finds that the evidence, which the court has considered, does not influence its decision.  Therefore, the court will deny defendant's Motion to Strike.

[5]"The more remote or indirect the act claimed to create a hostile working environment, the more attenuated the inference that the worker's working environment was actually made unbearable, as the worker claims.  Offense based purely on hearsay or rumor really is "second hand"; it is less credible, and, for that reason and also because it is less confrontational, it is less wounding than offense based on hearing or seeing . . . ."  *Yuknis v. First Student, Inc.*, 481 F.3d 552, 555-56 (7th Cir. 2007).

hands down her pants, and pull off her pants," and "enlisting the assistance of others to hold her while he attempted to grope her"); *Johnson*, 234 F.3d at 509 (finding harassment was objectively severe and pervasive based on "fifteen separate instances of harassment over the course of four months,"which included the harasser "giving [plaintiff] unwanted massages, standing so close to [plaintiff] that his body parts touched her from behind, and pulling his pants tight to reveal the imprint of his private parts") *with Gupta*, 212 F.3d at 584-85 (harassing conduct - including "one occasion [when harasser said], 'You are looking very beautiful,'" frequent telephone calls, isolated "comments about the promiscuity of people from Jamaica as compared to the innocence of people from India," harasser "stared at [plaintiff] twice, touched her ring and bracelet once, and kept asking her to lunch," and harasser "plac[ed] his hand on [plaintiff's] knee once, and . . touch[ed] the hem of her dress once" over six or seven months – was not sufficiently severe or pervasive conduct); *Mendoza*, 195 F.3d at 1247 (harassing conduct – "(1) one instance in which [the harasser] said to [plaintiff,] 'I'm getting fired up'; (2) one occasion in which [the harasser] rubbed his hip against [plaintiff's] hip while touching her shoulder and smiling; (3) two instances in which [harasser] made a sniffing sound while looking at [plaintiff's] groin area and one instance of sniffing without looking at her groin; and (4) [harasser's] 'constant' following and staring at [plaintiff] in a 'very obvious fashion'" – not sufficiently severe or pervasive).

Therefore, because the court finds that the harassment was not sufficiently severe and/or pervasive to support a claim for discriminatory harassment, defendant's motion for

Summary Judgment is due to be granted, and plaintiff's sex and age hostile environment harassment claims will be dismissed.

## B. PROMOTIONS

Plaintiff alleges that she was not selected for two promotions because of her gender and/or her age: Knoxville Operations Manager in May 2000, and Oxford Operations Manager in August 2000.  (*Id*. at 225-33, 240, 263-65.)  Plaintiff does not oppose defendant's Motions for Summary Judgment as to the Knoxville position.   T h e r e f o r e , summary judgment as to that claim will be entered in favor of defendant.

Plaintiff complains that she was not promoted to Operations Manager at the Oxford store because of her age and her gender.  Defendant contends that plaintiff was not qualified for the position and that she cannot show that its reasons for selecting a younger man for the position are a pretext for discrimination.

"To establish his prima facie case of discriminatory failure to promote, [plaintiff] must show that (1) [she] was in a protected group; (2) [she] was not given the promotion; (3) [she] was qualified for the position and (4) someone outside of the protected group was given the position" *Standard v. A.B.E.L. Services, Inc.*, 161 F.3d 1318, 1333 (11th Cir. 1998).  For purposes of summary judgment, the court finds that plaintiff has established a prima facie case of age and/or gender discrimination as to the Oxford Operations Manager position.  *See Walker v. Mortham*, 158 F.3d 1177, 1187-93 (11th Cir. 1998).

17

Heil, the decisionmaker, testified that he chose Ken Wood for the Oxford Operations Manager position because he had experience as an Operations Manager. Plaintiff alleges that this reason is unworthy of credence because Heil did not consider plaintiff for the position at all, defendant's reliance on the unwritten job requirement of prior experience as an Operations Manager suggests pretext and because another decision maker articulated a preference for promoting younger men.

A plaintiff may establish that an articulated reason is unworthy of credence "either directly by persuading the court that a discriminatory reason more likely motivated the employer or indirectly by showing that the employer's proffered explanation is unworthy of credence." *See Carter v. City of Miami*, 870 F.2d 578, 584 (11th Cir. 1989). If a plaintiff chooses to establish pretext by showing that her employer's proffered reason is unworthy of credence, she must attack that reason "head on and rebut it." *Chapman v. AI Transport*, 229 F.3d 1012, 1030 (11th Cir. 2000). The plaintiff must offer evidence that "casts sufficient doubt on the defendant's proffered nondiscriminatory reasons to permit a reasonable fact finder to conclude that the employer's proffered 'legitimate reasons were not what actually motivated its conduct.'" *Combs v. Plantation Patterns*, 106 F.3d 1519, 1538 (11th Cir. 1997)(quoting *Cooper-Houston v. Southern Ry. Co.*, 37 F.3d 603, 605 (11th Cir. 1994)). "If the proffered reason is one that might motivate a reasonable employer, a plaintiff cannot recast the reason but must meet it head on and rebut it." *Wilson v. B/E Aerospace, Inc.*, 376 F.3d 1079, 1088 (11th Cir. 2004). A plaintiff cannot prove pretext simply by quarreling with

the wisdom of her employer's decision.  *Chapman*, 229 F.3d at 1029 (citing *Alexander v.*
*Fulton County*, 207 F.3d 1303, 1341 (11th Cir. 2000);  *Combs*, 106 F.3d at 1541-43).

Without question, Heil's rationale for selecting Wood – prior experience in the
position – is one that might motivate a reasonable employer.  The court finds Heil wanted
someone with experience for the Oxford position because Oxford was a new store, even
though prior experience was not a written job requirement for the Operations Manager
position generally.  Plaintiff's evidence that Willey considered her qualified for the position
of Operations Manager and that prior experience was not a written requirement for the
position, does not attack Heil's decision head on.  Moreover, evidence that plaintiff was not
considered for the position does not suggest that Heil's articulated reason is false; rather,
evidence that Heil did not consider plaintiff is consistent with his testimony that he required
an experienced Operations Manager for the Oxford position.  Simply put, the court finds no
evidence from which a reasonable jury could find that Heil's reason for selecting Wood for
the Oxford Operations Manager is unworthy of credence and that plaintiff was not selected
because of her age and her gender.

Defendant's Motions for Summary Judgment as to plaintiff's promotion claim based
on the position of Operations Manager in Oxford is due to be granted and this claim will be
dismissed.

19

## C. RETALIATION

Plaintiff contends that defendant suspended her Salary Continuation benefits, refused to transfer her to another store, and ultimately discharged her because she had complained about discrimination.  Defendant contends that its decision to suspend her benefits and to deny her request to transfer were not adverse employment actions.  Moreover, it contends that plaintiff cannot show that its articulated reasons for its decisions were a pretext for unlawful retaliation.

In order to establish a prima facie case of retaliation in violation of Title VII and ADEA, Plaintiff must establish: (1) a statutorily protected expression; (2) an adverse employment action; and (3) a causal link between the protected expression and the adverse action.  *Hairston v. Gainesville Sun Publishing Co.*, 9 F.3d 913, 919 (11th Cir. 1993).  To show an adverse employment action, "a plaintiff must show that a reasonable employee would have found the challenged action materially adverse, which in this context means it well might have dissuaded a reasonable worker from making or supporting a charge of discrimination."  *Burlington Northern and Santa Fe Ry. Co. v. White*, 548 U.S. 53, 126 S. Ct. 2405, 2415 (2006)(internal quotations and citations omitted).  "The causal link element is construed broadly so that a plaintiff merely has to prove that the protected activity and the negative employment action are not completely unrelated."  *Pennington v. City of Huntsville*, 261 F.3d 1262, 1266 (11th Cir. 2001)(quoting *Olmsted v. Taco Bell Corp.*, 141 F.3d 1457, 1460 (11th Cir.1998)(quoting *E.E.O.C. v. Reichhold Chem., Inc.*, 988 F.2d 1564, 1571-72

(11th Cir.1993)))(internal quotations omitted).  "Once a plaintiff has established a prima facie case, the employer then has an opportunity to articulate a legitimate, non-retaliatory reason for the challenged employment action. The ultimate burden of proving by a preponderance of the evidence that the reason provided by the employer is a pretext for prohibited, retaliatory conduct remains on the plaintiff." *Id.* (citations omitted).

Defendant contends that suspending plaintiff's Salary Continuation benefits was not an adverse employment action because it rescinded the decision and paid plaintiff all past benefits. (Doc. 12 at 24.)  The Eleventh Circuit has held that "when an employee loses pay or an employment benefit from [an employer's decision], courts have held that the employment action is not adverse . . . when the action is rescinded and backpay is awarded." *Pennington*, 261 F.3d at 1267 (citing *Dobbs-Weinstein v. Vanderbilt University*, 185 F.3d 542, 544 (6th Cir. 1999); *Benningfield v. City of Houston*, 157 F.3d 369, 378 (5th Cir.1998)). The facts are not disputed that defendant rescinded its decision to suspend plaintiff's Salary Continuation benefits and paid plaintiff her back benefits.  Therefore, according to Eleventh Circuit precedent, suspension of her Salary Continuation benefits is not an actionable adverse employment action, and plaintiff's retaliation claim based on the suspension of her benefits is due to be dismissed.

Defendant argues that its failure to grant plaintiff's request for a transfer was not an adverse employment action because Eleventh Circuit case law provides that refusal to grant a request for a lateral transfer is not an adverse employment action.  (Doc. 12 at 24 [citing

21

*Doe v. Dekalb County School District*, 145 F.3d 1441, 1453 (11th Cir. 1998)].)  However, considering the circumstances of this case for purposes of summary judgment, the court finds that the failure to transfer plaintiff, under the circumstances, was an adverse employment action.

> As the Supreme Court stated recently:
>
> The anti-retaliation provision protects an individual not from all retaliation, but from ***retaliation that produces an injury or harm***.  As we have explained, the Courts of Appeals have used differing language to describe the level of seriousness to which this harm must rise before it becomes actionable retaliation.  We agree with the formulation set forth by the Seventh and the District of Columbia Circuits.  Rather, the standard is tied to the challenged retaliatory act, not the underlying conduct that forms the basis of the Title VII complaint.  By focusing on the materiality of the challenged action and the perspective of a reasonable person in the plaintiff's position, we believe this standard will screen out trivial conduct while effectively capturing ***those acts that are likely to dissuade employees from complaining or assisting in complaints about discrimination***.

*Burlington Northern and Santa Fe Ry. Co.*, 126 S. Ct. at 2415-16 (emphasis added).

Plaintiff has presented evidence that her doctors would not release her to return to work with Moretti following her emotional breakdown after their last encounter.  Thus, even though the requested transfer would not have resulted in increased wages or benefits and staying at the Huntsville store did not result in a loss of wages or benefits, requiring plaintiff to work with Moretti – the man she had accused of harassing her – was a materially adverse action that might well have dissuaded a reasonable worker from making or supporting a charge of discrimination against Moretti.

Therefore, the court finds defendant's decision not to transfer plaintiff to be an adverse employment action.  Also, the court finds that the record supports a finding that plaintiff's complaint regarding harassment by Moretti, her request for a transfer, and defendant's denial of her request for a transfer are sufficiently causally connected to support a prima facie case of retaliation with regard to the denial of plaintiff's request for a transfer.

Plaintiff was terminated when she did not return to work in November 2001. Termination is an adverse employment action.  The court finds, for purposes of summary judgment, that plaintiff was terminated because she could not return to work with Moretti and defendant refused to grant her request for a transfer.  A reasonable jury could find that her termination was caused by defendant's failure to grant plaintiff's request for a transfer, which the jury could find was causally connected to plaintiff's complaints against Moretti. Therefore, the court finds that plaintiff has established a prima facie case of discrimination with regard to her termination.

Defendant contends that plaintiff was not allowed to transfer because its policy prohibited the transfer of inactive employees, including those on medical leave.  (Doc. 12 at 25.)  Plaintiff contends that this reason is unworthy of credence because the policy on which defendant relied was unwritten and was never communicated to plaintiff, and because defendant's written policy allowed inactive employees to return from leave to comparable positions.  (Doc. 25 at 12.)  She also contends that Squires's "dismissive attitude" suggests his reason for not transferring plaintiff was pretextual.  (*Id*. a 13.)

The court finds that this evidence is insufficient to establish a question of fact as to the veracity of defendant's articulated reason for failing to transfer plaintiff.  Significantly, the court finds that the evidence that the policy followed was "unwritten" is insufficient to challenge that such policy exists without some evidence that other inactive employees have been transferred to another store or even to another position within the same store **before** returning to active status.  *See Stein v. National City Bank*, 942 F.2d 1062, 1065 (6th Cir. 1991)("Whether a policy is written or unwritten has minimal probative value on the issue of pretext. It may tend to prove that a defendant attaches little weight to the policy, but this can be rebutted by evidence that the policy was reliably communicated by the employer to its employees and that it was consistently enforced."), *cited in Williams v. Alabama Industrial Development Training*, 146 F. Supp. 2d 1214, 1226 (M.D. Ala. 2001)("But Congress does not force employers to amass an encyclopedic collection of rules that are known throughout the shop.  When an employee like Williams understands the general thrust of an unwritten work rule, decisions based on the rule are not pretextual absent concrete evidence that the rule was used as a mask for retaliation.")

Because the court finds that the evidence is insufficient to establish a question of fact as to the credibility of defendant's articulated reason, defendant's Motion for Summary Judgment as to plaintiff's retaliation claim based on her transfer request is due to be granted.

As to her termination claim, the record contains evidence that defendant terminated plaintiff because she failed to return to work after her medical leave was exhausted.  Plaintiff

24

offers no evidence that this was not the reason she was terminated or that her termination was not automatic; rather, she appears to argue that she would have returned to work if her request for a transfer had been granted.  Such evidence does not establish that defendant's articulated reason for terminating plaintiff, her failure to return from medical leave after a year, was a pretext for retaliation.

Therefore, defendant's motion for Summary Judgment as to plaintiff's retaliation claim based on the termination decision is due to be granted.

## D.  OTHER CLAIMS

Because she has not opposed defendant's Motions for Summary Judgment as to her disparate-impact claim and her state-law claims, the court finds that plaintiff has abandoned those claims.  *See Barnes v. Crowne Investments, Inc.*, 391 F. Supp. 2d 1108, 1114 (S.D. Ala. 2005)(citing *Wilkerson v. Grinnell Corp.*, 270 F.3d 1314, 1322 (11th Cir. 2001); *Boex v. OFS Fitel, LLC*, 339 F. Supp. 2d 1352, 1371 (N.D. Ga. 2004)).  Defendant's Motions for Summary Judgment will be granted as to plaintiff's claims of disparate impact discrimination and state-law negligence.

## <u>CONCLUSION</u>

For the foregoing reasons, the court is of the opinion that there are no material facts in dispute and defendant is entitled to judgment as a matter of law as to plaintiff's claims. An Order granting defendant's Motions for Summary Judgment, (docs. 11, 23), will be entered contemporaneously with this Memorandum Opinion.

**DONE**, this the 27th day of March, 2008.

*Sharon Lovelace Blackburn*
_____
SHARON  LOVELACE  BLACKBURN
CHIEF UNITED STATES DISTRICT JUDGE